### THE SALTON SEA CASES.

### CALIFORNIA DEVELOPMENT CO. v. NEW LIVERPOOL SALT CO.†

(Circuit Court of Appeals, Ninth Circuit. August 2, 1909.)

#### No. 1,584.

1. WATERS AND WATER COURSES (§ 177*)—FLOWAGE—INJUNCTION.

A court of equity has jurisdiction to enjoin the diversion of water from a stream by means of canals, whereby the property of complainant is flooded and threatened with irreparable injury.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 260, 264; Dec. Dig. § 177.*]

2. INJUNCTION (§ 197*)—CONTINUING TRESPASS—DAMAGES IN ADDITION TO INJUNCTION.

Where a court of equity has acquired jurisdiction of a suit to enjoin a continuing trespass upon land, it may also, to prevent a multiplicity of suits, award damages for the injury already done, although the same would also be recoverable by an action at law.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. § 417; Dec. Dig. § 197.*]

3. COURTS (§ 262*)—JURISDICTION—ADEQUATE REMEDY AT LAW—FEDERAL STATUTE.

Rev. St. § 723 (U. S. Comp. St. 1901, p. 583), providing that suits in equity shall not be sustained in either of the courts of the United States in any case where a plain, adequate, and complete remedy may be had at law, is merely declaratory, and does not narrow the jurisdiction of courts of equity, nor prevent the granting of legal relief therein where jurisdiction has been acquired to grant equitable relief, and the legal remedy is not as practical and efficient.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 798; Dec. Dig. § 262.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes
† Rehearing denied October 4, 1909.

**4. WATERS AND WATER COURSES (§ 263\*)—SUIT TO ENJOIN INJURY BY FLOW-AGE—PARTIES.**

Defendant corporation undertook to divert water from the Colorado river near the boundary line between California and Mexico through canals for irrigation purposes. It contracted with a Mexican company, which it owned, and with other local irrigation companies which it organized in California, to deliver water to their canals and ditches. It constructed three intakes from the river, two of which were on Mexican territory on land of the Mexican company and nominally under its control, but which were, in fact, constructed and controlled by defendant. These intakes were so constructed without controlling gates that in a time of flood one of those in Mexico was so enlarged by washing that a large part of the water of the river poured through and passing through canals of the other companies overflowed and damaged, and finally destroyed the property of complainant situated in the Salton Basin below the level of the river. *Held,* that having sole control of the intakes, from the improper construction of which the damage resulted, defendant was responsible therefor, and that to a suit to enjoin further flooding and to recover for the damage done the other corporations were not necessary parties.

[Ed. Note.—For other cases, see Waters and Water Courses, Dec. Dig. § 263.\*]

**5. EQUITY (§ 36\*)—PREVENTING INJURY TO REAL PROPERTY—JURISDICTION OF COURT.**

A court of equity having jurisdiction of the parties may enjoin a continuing injury to real property within its jurisdiction by flooding caused by the improper construction of works maintained by defendant for diverting the water of a river into a canal, although such works are across the boundary within the republic of Mexico.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 94, 96; Dec. Dig. § 36.\*]

**6. WATERS AND WATER COURSES (§ 177\*)—INJURY TO REAL ESTATE—INJUNCTION.**

A court of equity has jurisdiction to enjoin the maintenance of works which caused the flooding and injury of lands owned by complainant, notwithstanding the fact that pending the suit the flooding continued and entirely destroyed the present value of the property for which damages were awarded; the title to the land still remaining in complainant.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 260–264; Dec. Dig. § 177.\*]

**7. WATERS AND WATER COURSES (§ 262\*)—IRRIGATION COMPANIES—LIABILITY FOR FLOODING OF LANDS—CONCURRING NATURAL CAUSES.**

An irrigation company which negligently constructed the intakes from the Colorado river into its canal without headgates or other means of controlling the flow, by reason of which in a time of flood the water flowed through in such volume as to wash away the river bank and overflow the lands of others, is not relieved from liability therefor by the fact that the flood was extraordinary.

[Ed. Note.—For other cases, see Waters and Water Courses, Dec. Dig. § 262.\*]

Appeal from the Circuit Court of the United States for the Southern Division of the Southern District of California.

See, also 172 Fed. 820.

John S. Chapman and E. A. Meserve (Eugene S. Ives, of counsel), for appellant.

Edward J. McCutchen and Purcell Rowe (Page, McCutchen & Knight, of counsel), for appellee.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

---

\*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

MORROW, Circuit Judge. The Colorado river is formed in the southwestern part of Utah by the junction of the Green river from the north and the Grande river from the northeast; the former rising in the Wind River Mountains of Wyoming, and the latter in the Rocky Mountains of Colorado. The waters of the Colorado river carrying its wash of silt, sand, and earth, and, flowing south and west, empties into the Gulf of California about 75 miles below the international boundary line between the United States and Mexico. It is probable that many centuries ago the Gulf of California extended in a north-westerly direction into what is now known as the Salton Basin in California, but, by reason of the discharge of silt, sand, and earth by the Colorado river into the Gulf of California near Yuma, the present delta has been gradually formed, pushing the waters of the gulf further and further south, and extending the barrier of the delta across the northwest arm of the gulf to the foothills on the southwest, thus separating the Salton Basin from the waters of the gulf. The lowest part of Salton Basin is 287 feet below the level of the sea, and is called the "Salton Sink." There is geological evidence that the Salton Basin was once filled with the salt waters of the gulf, which have since evaporated, leaving the basin practically dry, except when the Colorado river during high water has overflowed its banks and poured into the basin. The river in a normal condition has, however, followed its shifting channel down the delta into the Gulf of California, spreading its deposit of sediment over a constantly enlarging area. The region is arid, but with the aid of irrigation the soil becomes enormously productive. The international boundary line between the United States and Mexico crosses this basin north and west of the Colorado river and its delta. There is a large area of land north and west of the river, both above and below the boundary line, capable of being brought under cultivation by the use of water diverted from the Colorado river.

The present action arises out of such a diversion through intakes for which no provision had been made for the regulation and control of the water drawn from the river into irrigation canals, and as a result the diversion grew to such proportions as to turn nearly the entire Colorado river into the irrigation canals, and through them into the Salton Sink, overflowing the land and destroying much property in that section. This suit was originally commenced by the appellee on March 8, 1905, in the superior court of the state of California in and for the county of Riverside, and later was moved, upon the petition of the appellant, to the United States Circuit Court for the Southern District of California, Southern Division. The appellant is a corporation organized under the laws of the state of New Jersey. The appellee is a corporation organized under the laws of the state of California. The action was brought to recover the damage resulting from the flooding and overflowing of complainant's lands by the defendant's diversion of water from the Colorado river and for an injunction restraining the continuance of such diversion. After the case had been removed to the United States Circuit Court, the complaint was framed as a bill in equity in accordance with the practice of federal courts. The bill of

complaint alleged that complainant, the New Liverpool Salt Company, was a corporation duly organized and existing under the laws of the state of California, with its principal place of business at Los Angeles, Cal.; that it was the owner of certain tracts of land situated in township 8 south, range 10 east, San Bernardino meridian, and was engaged in the business of mining, gathering, and refining salt, owning and operating a plant for the manufacture of salt, consisting of a mill, drying sheds, and warehouses, equipped with the necessary machinery for reducing and refining salt; that this plant was situated upon the northeast quarter of section 14 in said township; that the buildings and equipment were valued at more than $50,000; that it carried on an extensive business, selling many thousands of tons of salt yearly; and that sections 15 and 23 of the lands in said township and owned by complainant were of great value because of their salt deposits; that the Colorado river is a large and navigable stream of water, carrying many thousand second feet of water, and flowing naturally from its sources in Colorado, Nevada, and Utah, to the Gulf of California, and that no part of the waters of said river flow naturally upon or near the lands of complainant above described. It is alleged that defendant had carried on the business of diverting the waters of the Colorado river by means of three intakes constructed for that purpose, carrying the water of the river to Calexico, Cal., distributing it for irrigation purposes by means of various canals; that defendant by means of said intakes and canal had been for many months, and then was, diverting from the Colorado river a stream of water varying in amount of flow from 800 to 3,000 cubic feet per second, which flow of water, after entering said canal, was carried therein and thereby to various points, passing into the New river, the Alamo river, and various waste and distributing canals. It is alleged that the lands of the complainant were about 280 feet below sea level; that, by reason of the contour and slope of the land from the points to which the water is carried by the defendant, the water except such as was absorbed and evaporated found its way through the various waste and distributing canals and water courses to the Salton Sink and to the lands of the complainant; that, for a period of more than six months, defendant had been diverting a large amount of water, and that a flow of between 300 and 500 cubic feet per second passed through this canal in excess of the amount absorbed, evaporated, or used for irrigation purposes; that such an amount of water had been for three months continually wasting from the canal system of defendant and pouring into Salton Sink, making a lake over 20 miles in length and several miles in width, overflowing and covering completely certain sections of complainant's lands, and had reached within 200 feet of its mill, compelling complainant to erect and maintain dykes; that the water was continuing to increase, and, if not checked, would overflow the dykes and flood the ground about the buildings, and destroy many thousand tons of salt which belonged to complainant and was piled upon the ground; that this water carried large quantities of sand and silt which was being deposited upon the lands covered by the salt, thereby covering up the salt deposits, and making it impure and more diffi-

cult to mine; that the railroad which complainant owned and operated had been entirely covered by the overflow of waste water and the sand and silt deposits; that this waste water was still running into the lake in large quantities, increasing its size because no provision had been made by defendant at its intakes for the regulation and control of the waters; and, that if this flow was not stopped, complainant would suffer irreparable loss, and eventually its property and business would be destroyed, to its damage in a sum exceeding $200,000. It was alleged that the complainant had no speedy or adequate remedy at law. The principal facts stated in the bill are supported by affidavits attached to the original complaint. A temporary injunction was issued as prayed for in the complaint.

As the waters increased and the damage became greater, complainant on January 29, 1906, filed a supplemental bill containing the same allegations, and alleging that, by the continuance and increase in the amount of the flood, additional damage had been done its lands and salt deposits in the sum of $180,000, and that its plant had been utterly destroyed, whereby complainant had sustained a further loss of $30,000. On December 19, 1907, complainant filed an amendment to this supplemental bill, substituting $325,000 for $180,000 as additional damage to its lands and salt deposits, and substituting $75,000 in place of $30,000 as the damage to its sheds, mill, and machinery. This amended and supplemental bill was filed after the complete destruction of complainant's plant, when damage was asked for in the above amounts, and a writ of injunction prayed for enjoining defendant from diverting said waters unless suitable headgates were provided to control the water, so that the flow would not be in excess of the amount used for irrigation purposes. To the bill the defendant demurred upon the ground that it appeared upon the face of the bill that complainant was not entitled to the relief prayed for; that the bill was multifarious because it united two different suits, one for legal, and the other for equitable, relief, and that the same could not be united; that the causes set forth in the bill were not within the jurisdiction of the court sitting as a court of equity. The demurrer was overruled, and thereupon the defendant answered the bill, and subsequently filed an amended answer to the bill and supplemental bill. The defendant in its answer denied generally the allegations of the complaint; admitted that complainant's land was below the level of the sea, and in what was known as Salton Sink, and that water flowing into the New river or Alamo river naturally found its way to the Salton Sink unless diverted from said rivers; admitted that waste water at the time of the filing of the bill was still running into the lake and increasing its size, but alleged that the waters referred to were diverted from the Colorado river in Mexico by a corporation organized under the laws of the republic of Mexico, known as La Sociedad de Yrrigacion y Terrenos de la Baja California (Sociedad Anonima), which corporation owned all canals leading from the Colorado river in Mexico to the town of Calexico, Cal.; and denied that it diverted any water from the Colorado river which flowed into either the Alamo or New river or upon any of complainant's land; denied, further, that there were no streams of water which naturally run upon

complainant's lands, and alleged that flood water coming down from Alamo and New rivers, in flood times, such as existed during the years 1904-05, and particularly during the winter season of 1905, and waters flowing from the natural drainage from the mountains and surrounding locality of Salton Sink, would flow upon complainant's lands; alleged that the natural flow of these waters would be to the lands of complainant, and that Salton Sink without any water being carried there by canals in 1905 would have become a lake and overflowed complainant's lands; alleged that, if the canals had not been constructed and the waters coming down Colorado river had been allowed to take their natural course, they would have overflowed the banks of the Colorado river, flowed into the channels therefrom, and found their way over the surrounding country through the sloughs and bayous into Salton and Alamo rivers, then to Salton Sink, and to and upon the lands of complainant, and that, if these canals had not been constructed, all of complainant's lands would have been overflowed by these waters; further alleged that, if the flow of waste waters were stopped and defendant not permitted to divert the waters of the Colorado river into the lake, the same would evaporate and disappear, and that it was not diverting any of the waters of the Colorado river into this lake, and denied that complainant had suffered the damage alleged, or any damage at all. In an amended answer it further denied that complainant had since the commencement of the action or by reason of any acts of defendant been damaged in any sum whatsoever.

Defendant set up in its answer: That certain public land of the United States in San Diego county, Cal., known as Imperial Valley, was practically desert land, being of a dry and sandy character, but with proper irrigation could be made fertile and valuable. That in 1896 the defendant California Development Company was organized under the laws of the state of New Jersey for the purpose of obtaining water from the Colorado river to supply said Imperial Valley, together with a large tract of land in the republic of Mexico. That defendant, through an arrangement with a Mexican corporation, undertook to divert the waters of the Colorado river at a point a short distance above the boundary between the United States and Mexico, and by means of a canal to conduct this water through the Mexican tract and to the boundary line between the United States and Mexico for irrigation purposes in both republics. That defendant in 1900 began the construction of a canal which when completed ran through, down to, and across the lands in Mexico and to the boundary westerly from the Colorado river. That divers water companies were organized under the laws of the state of California, and known, respectively, as Imperial Water Companies Nos. 1 to 8, inclusive, which were organized for the purpose of taking the waters from the said canals and furnishing it to settlers upon the lands situated in San Diego county, Cal., for irrigation and domestic purposes, and contracts were entered into between the defendant and the several Imperial Water Companies for furnishing this water. That in pursuance of these contracts divers lateral canals were constructed by them, through which the waters so diverted by the said canals were to be delivered and distributed to the settlers

upon the said tracts. That these several lateral canals were completed, and a large amount of the lands in Imperial Valley had been settled upon by persons who became purchasers of stock in said several water companies. That, prior to the commencement of this suit, over 100,000 acres of land in Imperial Valley had been brought under cultivation, and water had been furnished to the owners of this land and settlers thereon for irrigation and domestic uses, and that the lands had proven to be of great agricultural value. That for more than two years defendant had furnished the several Imperial Water Companies from the main canal connecting with the Colorado river. That this canal at its head had become filled up with silt, so that it was incapable of carrying water sufficient to furnish the owners and settlers of the valley with water in quantities sufficient to insure the successful cultivation of their lands, and for that reason a second canal ·was constructed a few miles south of the first intake, which also became silted, and in the course of time a third intake was made because of the prospective demand for water during the season of 1904. Meantime towns had sprung up in the valley which were to be supplied with water, and there were more than 10,000 people who were dependent upon this water for irrigation and domestic usages. That in the construction of these canals—both the main canal, intakes, and laterals—defendant had provided for the use of water diverted thereby, and for taking care of the same by wasting upon a broad expanse of territory more than 25 miles south of Salton Sink in such a way that under ordinary conditions, and conditions which from the past conditions could be foreseen, the waters could have been handled and distributed so that no injury would have occurred to the property of complainant. But in 1904 and 1905 the rains falling in that locality and in the surrounding mountains were greatly in excess of anything that had occurred previously which made the demand for water less than it otherwise would have been; also later in 1904 and 1905, and particularly in the summer of 1905, enormous floods occurred in the Colorado river with greater frequency and longer duration than had ever been known to occur before, and because of these and the overflow of the Colorado river the main canal became washed out and vast amounts of water from the Colorado river continued to flow through it until practically all the waters of the Colorado river were flowing through this canal, and defendant alleged that but for this canal Salton Sink would have been filled to an extent probably greater than was actually experienced. That these canals by embankments thrown up in their construction prevented a large amount of water flowing from the Colorado river into Salton Sink by diverting it into other directions. It alleged that more than $250,000 had been spent for the construction of its irrigation system, and that not less than $5,000,000 had been spent in the settlement and improvement of Imperial Valley, and that the value of this property dependent upon the waters from said water system for irrigation and domestic purposes exceeded $10,000,000, and that this property would be rendered worthless without the use of these waters, and alleged that there was no other source from which the people can be supplied with water. It further alleged that since the floods began it had spent large sums of money to prevent these overflows, exclude the

flood waters, and confine the river to its natural channel, and alleged that it had not been by any act or negligence on its part that the floods have filled Salton Sink, but that the lake was caused by the enormous, frequent, and long-continued floods of the Colorado river.

The complainant filed its replication and upon the issues thus presented testimony was taken, and thereafter a decree was entered by the court in favor of the complainant perpetually restraining and enjoining the defendant from diverting from the Colorado river any of the waters thereof in excess of the substantial needs of the people dependent upon the canal described in complainant's bill of complaint for water supply for domestic and irrigation uses and purposes, and such other lawful purposes as the same might be applied to; that the water so diverted, whatever might be the amount, should be so controlled and used that the same should not flow upon the lands of the complainant described in the bill of complaint; that the defendant regulate the flow of any water that might be diverted by it so that there should be no waste water flowing therefrom as the result of such diversion upon or over the lands of complainant; that defendant should be restrained from turning out of its canals any waste water at any point whence the same would naturally flow upon or over the lands of complainant or into the lake covering the Salton Sink, and thereby substantially increase the amount of water therein, or prevent the decrease thereof by any causes. It was further adjudged that the complainant had been damaged in the sum of $456,746.23 by reason of the commission of the acts mentioned in the bill of complaint by defendant, that complainant was entitled to recover compensation therefor; and it was ordered, adjudged, and decreed that complainant should have and recover from the defendant the said sum of $456,746.23, together with costs and disbursements. The defendant has brought the case here on appeal.

It is assigned as error that the court sustained the jurisdiction of the Circuit Court as a court of equity to restrain the wrongful diversion of the water of the Colorado river and awarded damages resulting from such diversion. The original bill of complaint invoked the equity jurisdiction of the Circuit Court on the ground that the complainant had no speedy or adequate remedy at law, in that an irreparable injury was then threatened and being done by the continuing act of the defendant in diverting the waters of the Colorado river to such an extent as to overflow complainant's lands and destroy its salt deposits, mill, drying sheds, warehouses, and other property used in reducing and refining salt. In 2 Daniell's Chancery Pleading & Practice (6th Ed.) p. 1631, the rule is stated as follows:

"An injunction will also be granted in some cases where the parties have both legal titles and legal remedies, but irreparable mischief would be done unless they were entitled to more complete relief than that which they would obtain at law. It has accordingly been granted where the injunction amounted in fact to an injunction to stop a trespass; for, if the court would not interfere against a trespasser, he might go on by repeated acts of damage, which would be absolutely irremediable."

In Erhardt v. Boaro, 113 U. S. 537, 5 Sup. Ct. 560, 28 L. Ed. 1113, the Supreme Court of the United States held that:

"It is now a common practice where irremediable mischief is being done or threatened, going to the destruction of the substance of the estate, such as the extraction of ores from a mine, or the cutting down of timber, or the removal of coal, to issue an injunction, though the title of the premises be in litigation."

To the same effect is Northern Pac. R. Co. v. Hussey, 61 Fed. 231, 9 C. C. A. 463; Oolagah Coal Co. v. McCaleb, 68 Fed. 86, 15 C. C. A. 270; Dimick v. Shaw, 94 Fed. 266, 36 C. C. A. 347. In United States Freehold Land & Emigration Co. v. Gallegos, 89 Fed. 769, 32 C. C. A. 470, the bill of complaint was filed to restrain the defendants from diverting the waters of the Culebra river in Colorado from the natural channel in excess of the amount that they might show themselves lawfully entitled to for irrigation and domestic purposes, such diversion being to the damage of complainant's land. The Circuit Court of Appeals for the Eighth Circuit held that:

"A continuing trespass upon real estate or upon an interest therein, to the serious damage of the complainant, warrants an injunction to restrain it. A suit in equity is generally the only adequate remedy for trespasses continually repeated, because constantly reoccurring actions for damages would be more vexatious and expensive than effective"—citing cases.

In Dimick v. Shaw, 94 Fed. 266, 36 C. C. A. 347, the appeal was from an interlocutory order granting a temporary injunction restraining the appellants from working a mine, and from extracting or removing ores therefrom. The title to the mine had been in litigation between the parties, but had been finally determined in favor of the appellee. While the litigation was pending the appellants went into possession of the land in controversy under the verbal permission of the appellee's manager for the purpose of prospecting only until the final determination of the case. After the case had been determined, the appellants had been notified to quit the premises, but refused, and had commenced mining operations on a larger scale, and continued their mining operations and trespasses. In the Circuit Court of Appeals it was contended that appellee had a complete and adequate remedy at law, and that the suit in equity deprived the appellants of their constitutional right of a trial by jury. The Circuit Court of Appeals held that the Circuit Court as a court of equity had jurisdiction of the case, referring to authorities, among others, to the case of Oolagah Coal Co. v. McCaleb, 68 Fed. 86, 15 C. C. A. 270, where it had been said:

"It is now well settled by many adjudications, beginning with the case of Mitchell v. Dors, 6 Ves. 147, that an injunction may be granted to restrain a trespasser from entering a mine and removing the minerals therefrom. Trespasses of that kind, as well as those which consist in cutting down and removing timber, or in removing buildings or other improvements of a permanent character standing upon lands, are readily enjoined, because, as has sometimes been said, such acts tend to destroy the estate, and to occasion irreparable loss and damage."

In Story's Equity Jurisprudence, § 927, it is said:

"Cases of a nature calling for the like remedial interposition of courts of equity are the obstruction of water courses, the diversion of streams from mills, the back flowage on mills, and the pulling down of the banks of rivers, and thereby exposing adjacent lands to inundation, or adjacent mills to destruction."

In Learned v. Castle, 78 Cal. 454, 18 Pac. 872, 21 Pac. 11, the Supreme Court of California held that the diversion of waters by a canal whereby the land of another is flooded by water that would not flow there naturally is to create a nuisance per se, for which a court of equity will grant relief by its writ of injunction.

In the present case the title to the land is not in litigation. The right of the complainant to the land claimed by it and to dig and remove the salt therefrom is not in controversy. The question is the right of the complainant to have the aid of a court of equity to protect its estate from destruction. This is clearly a subject of equitable jurisdiction under all the authorities, and, as we understand, it is not controverted; but the question is whether the Circuit Court, having acquired equity jurisdiction of the controversy for the purpose of administering relief by way of injunction, may proceed and award damages for the injuries sustained by the complainant by reason of defendant's diversion of the waters of the Colorado river and the flooding of complainant's land which it was the purpose of the action to enjoin.

It is contended on behalf of the appellant that, as the Constitution of the United States (article 7, § 1) secures the right of trial by jury in all actions at law where the amount in controversy exceeds twenty dollars, the right to such a trial in a federal court cannot be defeated by blending legal and equitable causes of action. But it has been held that this provision correctly interpreted cannot be made to embrace the established exclusive jurisdiction of courts of equity, nor that which they have exercised as concurrent with courts of law. Shields v. Thomas, 59 U. S. 253, 262, 15 L. Ed. 368.

In High on Injunctions (4th Ed.) § 669, the rule is stated as follows:

"Where, therefore, a proper case is presented for an injunction, an account of the waste already committed and a decree for damages may be had in the injunction suit. Indeed, this would seem to be but the exercise of the ordinary prerogative of equity, that, when one resorts to a court of equity for one purpose, his case will be retained until the entire matter is disposed of upon the principle that the court having jurisdiction of the cause for one purpose will retain it to give general and complete relief, thereby preventing a multiplicity of suits."

The same general rule is stated by Pomeroy in section 231 of his work on Equity Jurisprudence, as follows:

"Where a court of equity has obtained jurisdiction over some portion or feature of a controversy, it may, and will, in general, proceed to decide the whole issues, and to award complete relief, although the rights of the parties are strictly legal, and the final remedy granted is of the kind which might be conferred by a court of law."

In section 237 of the same work it is said that:

"Equity therefore assumed a jurisdiction to grant an injunction restraining the commission of actual or threatened waste: and having obtained jurisdiction for the purpose of awarding this special relief, which, in many instances, is not complete, the court will retain the cause, and decree full and final relief, including damages, and, when necessary, an abatement of whatever creates the waste or causes the nuisance."

172 F.—51

In 1 Beach, Modern Equity Proceedings, § 91, the author says:

"Upon a bill for an injunction to prevent a threatened trespass, the court may under a prayer for general relief, and, in order to avoid a multiplicity of suits, award damages for the injury done by such trespass before the injunction was issued."

In Winslow v. Nayson, 113 Mass. 411, 421, Mr. Justice Gray, then Chief Justice of the Supreme Judicial Court of Massachusetts (afterwards a Justice of the Supreme Court of the United States), said:

"And the court, having obtained jurisdiction in equity of the case for this purpose (to restrain trespass), may properly, in order to prevent multiplicity of suits, and to do complete justice between the parties under the prayer for general relief, also award damages for the injury already done by the defendants to the plaintiff's premises, instead of obliging them to bring a separate action at law therefor. Jesus ·College v. Bloom, 3 Atk. 262; Cathcart v. Robinson, 5 Pet. 263, 278, 8 L. Ed. 120; Franklin v. Greene, 2 Allen (Mass.) 519; Creely v. Bay State Brick Co., 103 Mass. 514; Milkman v. Ordway, 106 Mass. 232; Brown v. Gardner, Har. (Mich.) 291."

In Omaha Horse Ry. Co. v. Cable Tramway Co. (C. C.) 32 Fed. 727, 729, 730, in a suit for an injunction against the unlawful construction of a street railway, the defendant moved to dismiss the proceedings with reference to the assessment of damages on the ground that the court had no jurisdiction of such matter. The motion of the defendant was overruled. The court (Judge Brewer, now Mr. Justice Brewer of the Supreme Court) said that:

"Inasmuch as the prayer for relief contains also the general prayer for other and further relief, it is familiar law that the court may award such other relief as is justified by the facts stated in the bill, and may fairly have been considered within the contemplation of the parties in the litigation."

The decree ordered by the court awarded damages. In Woodbury v. Marblehead Water Co., 145 Mass. 509, 15 N. E. 282, the action was to restrain a water company from maintaining its pipes on plaintiff's land. It appeared that the original description of the land taken was not sufficiently accurate for identification, but that, after the bill was filed, the company had made a new taking and filed a complete description of the land with the exception that the names of the owners were omitted. Mr. Justice Holmes (now Mr. Justice Holmes of the Supreme Court) held that the injunction could not be granted, but that the bill might be retained for the assessment of damages, if any, with reference to the injury before the lawful taking.

It is further contended that under the provisions of section 723 of the Revised Statutes (U. S. Comp. St. 1901, p. 583) the court had no jurisdiction to combine legal and equitable remedies and award relief by way of damages in an action for an injunction. Section 723, Rev. St., provides as follows:

"Suits in equity shall not be sustained in either of the courts of the United States in any case where a plain, adequate, and complete remedy may be had at law."

It has been repeatedly decided that this provision is merely declaratory, making no alteration whatever in rules of equity on the subject of legal remedies, but only expressing the law which has governed proceedings in equity since their adoption in the courts of England.

In Bean v. Smith, 2 Mason, 252, 2 Fed. Cas. No. 1174, Mr. Justice Story said:

"I take this clause to be merely affirmative of the general doctrine of courts of equity, and in no sense intended to narrow the jurisdiction of such courts."

In Boyce v. Grundy, 3 Pet. 210, 213, 7 L. Ed. 655, the Supreme Court said:

"This court has been often called upon to consider the sixteenth section of the judiciary act of 1789 (section 723, Revised Statutes), and as often, either expressly or by the course of its decisions, has held that it is merely declaratory, making no alteration whatever in the rules of equity on the subject of legal remedy. It is not enough that there is a remedy at law. It must be plain and adequate, or, in other words, as practical and efficient to the ends of justice and its prompt administration as the remedy in equity."

In Whipple v. Village of Fair Haven, 63 Vt. 221, 21 Atl. 533, the action was to restrain the defendant from flooding the lands of complainant by means of a culvert maintained by the defendant and for damages caused by the discharge of water upon complainant's premises. The court said:

"The defendant also claims that the orators have an adequate remedy at law, and therefore cannot resort to chancery. The case of Field v. West Orange, 36 N. J. Eq. 118; 37 N. J. Eq. 434, above referred to, which is very much like this case in its facts, is full authority for granting the injunction prayed for; and it is a familiar rule that, when a court of chancery has jurisdiction of a case for one purpose, it will retain it for all other purposes, and dispose of the whole matter. And this is a salutary rule, for it prevents litigation, and to that end is for the public good."

We do not find anything in the authorities cited by the appellant in conflict with the doctrine of these cases, and upon a careful examination of the facts of the present case we do not find that they have any proper application. We are clearly of the opinion that the remedy at law would not have been "as practical and efficient to the ends of justice and its prompt administration" as the remedy afforded by the proceedings in this case.

It is contended that the corporation organized under the laws of the republic of Mexico known as La Sociedad de Yrrigacion y Terrenos de la Baja California (Sociedad Anonima), referred to in the case as the "Mexican Company," and the several water companies, organized for the distribution of water, referred to as "Imperial Water Companies," and designated by number as No. 1, 2, 3, 4, 5, 6, 7, or 8, as the case might be, were all necessary parties. It appears from the testimony that the defendant, the California Development Company, was organized under the laws of the state of New Jersey on April 23, 1896, for the purpose of diverting water from the Colorado river to be supplied to a large tract of land susceptible of irrigation in San Diego county, Cal., and also to supply water to a large tract of land likewise susceptible of irrigation in the republic of Mexico, and lying immediately south of the boundary line between California and the republic of Mexico. The construction of a canal in accordance with the purpose of the defendant corporation originally contemplated a diversion of the water of the Colorado river at a point in California known as "Hanlon's Heading." This was a rocky point on the west

bank reaching down to the river where the diversion could be placed under control. The first actual work of diversion was commenced in October, 1900, by George Chaffey, an engineer, who entered into an agreement with the California Development Company, and who undertook to divert the water and construct the canals in accordance with the proposed system of that company. The point of diversion selected and adopted by Chaffey was a short distance above the international boundary line in California about a mile below the rocky point known as "Hanlon's Heading." The reason given for this selection and making the diversion at that point was the fact that:

"The water could be secured quicker at this point, and Mr. Chaffey thought that he could control it for a time, and could secure water for the settlement much quicker that way, and cheaper, and he made a cut into the river at that point for the purpose of serving the settlements as quickly as possible and as cheaply as possible."

It was not intended to be a permanent work, but "it was called a temporary heading." From this point of diversion by the line of the canal to the point where the canal crossed into Mexico the distance was about 1,600 feet. It was the purpose of the defendant corporation to purchase the lands in the republic of Mexico, but it was found that under the laws of that Republic American citizens could not buy land within a certain prohibited zone except by special permission of the president of the republic of Mexico. Accordingly there was organized the "Mexican Company" having a small capital stock. The title to the land in Mexico and the channel of the Alamo river were vested in this Mexican Company. All the stock of the company, with the knowledge of the authorities of Mexico, was owned by the California Development Company, and the directors of the Mexican Company being all American citizens, there being, however, a Mexican citizen, a resident of Los Angeles, retained by requirement as secretary, and on whom all papers were served by the Mexican government. The charter of the Mexican Company provided that the principal place of business and the place where the annual election was to be held was Mexicala, in Mexico, just across the boundary line from Calexico, in California.

There was introduced in evidence a message from the President of the United States addressed to the Senate and House of Representatives relative to the threatened destruction by the overflow of the Colorado river into the sink or depression known as the Imperial Valley or Salton Sink Region dated, January 12, 1907. Attached to the message are a number of papers, including a statement made by Edwin A. Meserve, attorney for the California Development Company, which contains the following:

"About this time, the California Development Company, in the name of the Mexican Company, was granted by the republic of Mexico a concession by which it was permitted to take 10,000 second-feet of water from the Colorado river, in Mexico, with the right to carry one-half of that water and such water as was delivered to it at the boundary line by the California Development Company, back into the United States; the other one-half of all such waters to be devoted primarily to the irrigation of lands in Lower California, with permission, however, to carry into California all of that one-half of the water which was not needed for use in Mexico. The California Development Company, by

acquiring the title to the lands at Hanlons, had acquired the only site for controlling headgates on the river below what is now known as the Laguna dam. The site also controls what might be called or termed the gateway for the carrying of waters into Mexico and through Mexico again into the United States. By the terms of the concession from the Mexican government to the Mexico Company it was provided that no intake connecting with the Colorado river should be constructed in Mexico until the plans for all proposed structures were first approved by the proper engineering authorities of Mexico."

The time referred to in this statement appears to be the year 1903, when a shortage of water occurred, and the California Development Company found itself obligated to furnish to the settlers of the valley more water than the canal heading would take in, and consequently a second intake from the river to the canal was cut in the spring of 1904, just below the boundary line in Mexico. C. R. Rockwood, an engineer, was a witness on behalf of the defendant upon the trial of the case. From his testimony and that of others it appeared that he was one of the parties who organized the California Development Company; that he discovered from preliminary investigations made in May, 1892, that there was a very large body of fertile land lying to the west and north of the Colorado river, the extent of which he afterwards determined to be in the neighborhood of half a million acres, situated in the state of California, and probably an equal acreage in Lower California, Mexico; that the entire body of land was of a very arid nature, but rich in its soil, and probably would be very productive under irrigation, and his survey showed that the waters of the Colorado river could be distributed upon the land. He estimated that of a total acreage of something over 2,000,000 under the line of gravity flow from the canal heading .50 per cent. of this land would probably be available for agriculture. In its climatic conditions the country was very hot in summer. The annual rainfall he discovered from an investigation of the records was very light. The amount of water required for irrigation would be a maximum. According to his estimate made at the time, he believed that a quantity of water equal to four acre feet per annum for the entire 1,000,000 acres, or 4,000,000 acre feet, would be required during the year for the irrigation of the tract in Imperial Valley. This valley is immediately north of the international boundary line, and forms part of the Salton Basin in California. Reports were made to a corporation for which the witness Rockwood was then working, but the project for an irrigation enterprise failed and went to the wall for the time being. During 1895 he took up the project again, and associated with himself various individuals, and the result of it was the formation of the California Development Company in 1896. He and his associates then undertook the work of promotion. In order to do that, they entered into a contract for the purchase of 350,000 acres of land in Mexico, extending from the Colorado river through to the Cocopah Mountains on the west, and from the international boundary line between the river and Mexico to a line far enough south to include the 350,000 acres. This contract was afterwards cut down to 100,000 acres, and with this as a basis they undertook the capitalization of the company; but for various reasons they were unable to secure funds for the actual construction of the work until the year 1900. The work referred to related to

the diversion of the water from the Colorado river for the purpose of irrigating the lands embraced in the project. He intended to conduct the water from the river to a distance of about 14 miles by constructing a canal at a point where it would be carried into what is now known as the Alamo river. The Alamo river is a stream flowing in the direction of the Salton Sink. From the point where the canal would connect with the river the water would flow to the west, northwest, and across the international line into California. It was to cross the international boundary line at a point about seven miles east of what was afterwards known as Calexico. At this point it was the intention to put in diversion works across the Alamo to raise the water to the ground surface for distribution in California. It was originally intended to carry the water from Hanlon's Heading above the first intake on the Colorado river to a point on the Southern Pacific Railroad designated as Coachella. This point is west of the Salton Sink. The distance by the line of the canal between these points was estimated to be about 150 miles. The distance from Hanlon's Heading to the point of diversion at the international line east of Calexico would be about 49 miles by the road, and by the line of the canal, following the crooks and bends of the Alamo river, about 85 miles. The Alamo river was to be utilized as a part of the canal. The witness testified that the canal flowed along the channel of the Alamo river for a distance of 60 miles. In carrying out the scheme of the California Development Company to construct a system of canals for the distribution of the water diverted by it from the Colorado river, it entered into a contract with the Mexican Company on December 28, 1900, as follows:

"This indenture, made and entered into this 28th day of December, 1900, by and between the California Development Company, a corporation, duly organized and existing under and by virtue of the laws of the state of New Jersey, one of the United States, party of the first part, and La Sociedad de Yrrigacion y Terrenos de la Baja California (Sociedad Anonima), a corporation duly organized and existing under and by virtue of the laws of the republic of Mexico, party of the second part, witnesseth, that:

"Whereas, party of the first part is the owner of a certain tract of land situated in the county of San Diego, state of California, and particularly described as follows, namely: Lots three (3) and four (4), of section twenty-five (25), and the southeast quarter of section twenty-six (26), and lots one (1), two (2), three (3), and five (5), and the northwest quarter of the northeast quarter of section thirty-five (35); and lot one (1) of section thirty-six (36) in township sixteen (16) south, range twenty-one (21) east, San Bernardino Base and Meridian, containing 318.51 acres of land, more or less, according to the United States government survey; and,

"Whereas, the first party has appropriated and is the owner of a large amount of the waters of the Colorado river, and is engaged in the diversion of said waters from said Colorado river upon the lands so owned by party of the first part aforesaid, and is engaged in the construction of head-works and a canal upon said land, for the purpose of diverting said waters, and is engaged in the construction of an irrigation system, and a system of canals whereby the waters of the Colorado river so diverted upon the said land of first party as hereinbefore alleged, may be used for the irrigation of large tracts of land in Lower California, republic of Mexico, and in the state of California, United States of America; and,

"Whereas, said party of the second part is the owner of a tract of land containing about one hundred thousand (100,000) acres, situated in Lower California, republic of Mexico, a portion of which said tract of land is situated

adjoining and immediately south of the international boundary line between the United States of America and the republic of Mexico; and,

"Whereas, the irrigation system and system of canals so being constructed by party of the first part crosses said international line from a point upon the land so owned by party of the first part, to a point upon the land so owned by party of the second part; and,

"Whereas, the proposed extension of said canals and irrigation system extends through and across the lands of party of the second part in a generally southwesterly direction, and then in a generally northwesterly direction across the lands of party of the second part to various points upon said international boundary line, from which lands in California, United States of America, can be irrigated, and also extends to other points upon the land of second party from which the said land of second party and other lands in Lower California, republic of Mexico, can be irrigated; and,

"Whereas, party of the second part has entered into a certain contract with Imperial Water Company No. 1, a corporation organized and existing under and by virtue of the laws of the state of California, United States of America, whereby party of the second part agrees to deliver to said Imperial Water Company No. 1, at a point upon said international line a certain amount of water; and,

"Whereas, party of the second part contemplates entering into additional contracts with other water companies already formed or to be formed in the state of California, for the purpose of delivering to said water companies a large amount of water for the purpose of irrigating certain tracts of land situated in the state of California, which are irrigable from the proposed system and system of canals so to be constructed by party of the first part as hereinbefore stated; and,

"Whereas, party of the second part desires to obtain water for the purpose of complying with the contract so entered into between it (party of the second part) and said Imperial Water Company No. 1, and desires to obtain water for the purpose of complying with the contracts so proposed to be entered into between party of the second part and said corporations already incorporated in the state of California, and said corporations proposed to be incorporated in the state of California; and,

"Whereas, party of the second part desires to obtain a supply of water for the purpose of irrigating the lands so belonging to party of the second part as aforesaid; and,

"Whereas, party of the second part desires to obtain water for the purpose of furnishing the same for the irrigation of other lands situated in Lower California, republic of Mexico; and,

"Whereas, under the contract so entered into between party of the second part, and said Imperial Water Company No. 1, said Imperial Water Company No. 1 has granted to party of the second part the right to sell all of the water stock of it (Imperial Water Company No. 1); and,

"Whereas, party of the second part proposes to obtain similar contracts from other California corporations formed or to be formed;

"Now, therefore, in consideration of the obligations hereinafter imposed upon party of the second part, party of the first part hereby agrees:

"1. To build a system of canals from the point upon the lands of party of the first part, where said water is to be delivered from said Colorado river to and across said international line and across the lands of party of the second part to other points upon said international line from which large tracts of lands situated in the state of California, United States of America, can be irrigated; and also a system of canals from said point upon the Colorado river where said water is to be diverted from which the lands of party of the second part and other lands situated in Lower California, republic of Mexico, can be irrigated.

"II. Party of the first part further agrees to perpetually deliver to party of the second part a sufficient amount of the water so appropriated, owned and diverted, or to be in the future appropriated or diverted by party of the first part from the Colorado river, to enable party of the second part to furnish water for the irrigation of the lands situated in Lower California, republic of Mexico, and state of California, United States of America, which

are irrigable by gravity from the system of canals and irrigating system so to be constructed. Said waters so to be delivered by said system of canals to form an irrigation system for the purpose of irrigating lands situated in California, United States of America, and in Lower California, republic of Mexico, which are irrigable from the Colorado river by gravity. Said agreement to deliver said waters is made subject to and dependent upon the following conditions, namely:

"(1) No contract made or to be made whereby party of the second part has agreed or in the future shall or will agree to grant, transfer, deliver, or in any manner convey the right to use any of said waters to any person or corporation shall, by reason of priority in date, or any other reason, give to such person or corporation any prior or superior right over any other person or corporation who shall in any manner acquire from second party the right to use any portion of said waters.

"(2) Party of the first part shall not be responsible for a failure to deliver the water hereby agreed to be delivered from any cause beyond its control, but party of the first part shall use due diligence in protecting the system of canals so to be constructed by it as aforesaid, and in restoring and maintaining the flow of water therein.

"III. Party of the first part further agrees that it will keep said canals so to be constructed by it, as aforesaid, in repair at its own cost and expense, and that it will enlarge the same from time to time as may be necessary for the purpose of complying with the provisions of this agreement.

"IV. In consideration of the obligations herein incurred by party of the first part, party of the second part hereby grants, assigns and transfers to party of the first part all right which it, party of the second part, has in and to the stock of said Imperial Water Company No. 1, and all right which it has to receive any of the moneys which would otherwise be due and payable to party of the second part under said contract with said Imperial Water Company No. 1, from the sale of the stock of said Imperial Water Company No. 1. Second party further agrees that it will make like assignments in the future of all rights which it may acquire under contracts similar to said contract with Imperial Water Company No. 1, which it may make with other water companies in the state of California for the sale of the stock of said companies, or the proceeds to be derived therefrom.

"In witness whereof, party of the first part has caused its corporate name and seal to be hereunto affixed by its president and secretary, thereunto duly authorized by resolution of its board of directors; and,

"In witness whereof, party of the second part has caused its corporate name and seal to be hereunto affixed by its vice-president and secretary, thereunto duly authorized by resolution of its board of directors.

"Executed in duplicate the day and year first above written."

[Signed by the parties to the instrument.]

With respect to the relation of the California Development Company to the several so-called "Mutual Water Companies," organized under the laws of the state of California, it appears from the testimony that of the eight companies only six developed into active organizations, namely, Imperial Water Companies, Numbered 1, 4, 5, 6, 7, and 8. No. 2 was merged with No. 4, and No. 3 never became active. In an agreement entered into between the Mexican Company (referred to in the agreement as party of the first part) and Imperial Water Company No. 1 (referred to as party of the second part) and the California Development Company (referred to as party of the third part), dated July 24, 1901, the agreement of December 28, 1900, between the California Development Company and the Mexican Company is referred to and made a part of the agreement between the Mexican Company and the Water Company and the California Development Company. The agreement provides among other things as follows:

"VII. Third party hereby agrees that it will construct and maintain a main canal commencing at the point upon said international boundary line where said water is to be delivered to second party, and continuing from said point of commencement, through the lands described in the articles of incorporation of second party; said canal to be of sufficient capacity, either in its original construction or through subsequent enlargements, made from time to time by third party, at its own cost and expense, to convey an amount of water sufficient at all times for the irrigation of the lands owned or located by the stockholders of second party, and being an amount in the aggregate not less than sufficient to furnish four acre-feet of water per annum for each outstanding share of stock of second party. Said canal to be owned and maintained by third party, and third party to have the exclusive right to navigate said canal, and to develop and use all power that may be developed from the waters flowing therein. Third party further agrees to convey the water to be delivered by first party to second party thereunder, through said canal to the lateral ditches to be constructed by it as hereinafter provided.

"VIII. In the event that third party shall fail to construct or maintain the main canal herein agreed to be constructed by it, or to convey and deliver the water agreed by third party to be conveyed through said canal to the lateral ditches to be constructed by third party as hereinafter provided, then the second party shall have the right to enter upon said canal, and to make such additions and repairs thereto and changes therein as may be necessary in order that said canal shall have a capacity sufficient for the conveyance of the water to be conveyed therein hereunder, and second party shall have the right to convey the water through said canal, from the international line to said lateral ditches and the cost of such additions and changes in said canals, and the expense of the conveyance of said water through the same shall be a claim against third party to be recovered by second party from it by suit, if necessary.

"IX. Third party further agrees to construct a system of distributing ditches, together with all necessary gates and water weirs for second party from said canal so as to be constructed by it, as aforesaid, in such manner as to convey the waters from said canal to a point upon each governmental subdivision of 160 acres of land, from which it is practicable to irrigate the same, except as hereinafter provided, except that where the amount of land included in any original entry of any stockholder of second party exceeds 160 acres, then such water shall only be conveyed to such point upon the land included in such original entry; such distributing ditches to be thereafter owned and maintained by second party. Each and all lateral ditch or ditches, as soon as completed, to be turned over to second party and to be thereafter owned, possessed, controlled and maintained by it.

"Said lateral ditches to be constructed wherever necessary to irrigate the lands owned or located by the stockholders of second party, and to be either as originally constructed, or by subsequent enlargement, of ample size to convey to the stockholders of second party an amount of water equal to two-thirds of one (1) acre-foot per month for each share of stock of second party owned by them; Provided, that if any of the stock of second party shall have been sold by third party, and located upon any tract of land, which cannot at an expense of more than double the average cost of the construction of said lateral ditches, be irrigated by gravity from said lateral ditches, then third party at its option, may refund to the owner of the stock, which has been located upon said tract of land which cannot be irrigated as aforesaid, an amount of money for each share of stock located upon such land, which together with any balance then due to third party upon such stock shall equal the price at which third party is then selling such stock, and that upon making such payment, such stock shall thereupon be assigned to third party, and that by tendering said amount, third party shall be relieved from all obligation to construct such lateral ditches in such manner as to enable the owner of such land to irrigate the same therefrom.

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*

"XIII. \* \* \* That the main canal and system of lateral ditches to be constructed by third party hereunder shall be in operation by the first of January, 1902."

An agreement was entered into between the California Development Company and the Mexican Company and each of the other water companies in substantially the same terms as that with the Imperial Water Company No. 1. In the course of the hearing it was admitted by counsel for the California Development Company that that company incorporated the subsidiary water companies and made the contracts with them, and controlled them by its power over the stock. The diversion of water from the Colorado river was made through three intakes, one in California, and the other two in Lower California or Mexico. Intake No. 1 was commenced in October, 1900. The first water distributed or used for irrigation was drawn through this intake and carried by canal and the channel of the Alamo river through Mexican territory back to the international boundary line in the neighborhood of Calexico, where the first water was delivered to the water companies in California about June 15, 1901. Intake No. 2 was constructed in 1904, and was located just below the boundary line in Lower California or Mexico. Intake No. 3 was completed October 6, 1904, and was located about four miles below the boundary line, and, like intake No. 2, was in Lower California or Mexico.

The witness C. R. Rockwood testified that the reason for cutting intake No. 2 was purely political; that the right to take water from the Colorado river in the United States had been attacked by the reclamation engineers. The witness says:

"We then obtained concessions from Mexico which gave us the right to take water on Mexican soil from the river."

George C. Sexsmith, a witness called on behalf of the defendant, testified that from 1901 up to July, 1906, he was in the employ of the California Development Company with the exception of about six weeks. He worked on the Mexican end of the irrigation proposition as a sort of foreman. He was also employed in dredging near the upper heading trying to keep the canal open. His instructions were to keep the canal open if possible, but it silted up as fast as the silt could be removed. The machines employed were a dipper dredge and a hydraulic dredge; but with these two dredges he was not able to keep the canal free and open, so a by-pass was cut around the Chaffey gate to get more water into the canal. But even with the by-pass there was a shortage of water in the canal at the extreme low stage of the river. They closed up the by-pass when floods came down the river. It was opened three times and closed each time. During the times of flood the water was taken into the canal through the Chaffey gate, but the canal silted up from the Chaffey gate to the river. Then a second intake was cut just below the boundary line, and that was used from 2 to 2½ years. The canal was again almost entirely closed with silt when the third intake was cut. The point of diversion of the third intake was selected because they could get water through there and increase the water supply more readily than at any other point. The shortest distance between the river and the canal was at that point. It was simply a matter of removing the material. They were figuring on the shortest distance between the two points. It does not appear from any of this evidence that any provision was made at either of

these intakes for the regulation or control of the water drawn through them into the canal. In the latter part of June or the early part of July, 1904, before making this connection (between the river and the canal through intake No. 3), Mr. Rockwood stated to Mr. Heber, the president of the company (California Development Company), that, if he was furnished with lumber with which to build a controlling gate one month before the time when floods were to be expected, he would not have to close the intake even in the winter season. This Mr. Heber promised he would furnish, expecting to be able to do so, but the financial condition of the company continued to be such that he was never able to furnish the material for this temporary structure. This lower intake silted up once, and had to be dredged in order to keep the water flowing therethrough. The floods in the fall of 1904 came earlier than usual, with the result that the opening at this third intake began to wash and the inflow to increase, and from that day until the close of 1906 the condition continued to grow worse. By the middle of December, 1904, sufficient water was going into the canal through this lower intake to pass into the New river and on through the New river into the Salton Sink, starting what has since been known as the Salton Sea. The current of water flowing into the lower intake commenced to cut or wash some time in February or March, 1905, and while there is testimony that water began to accumulate in the Salton Sink as early as November or December, 1904, the flooding of Salton Basin which is the cause of the present action began about the time of the washing and breaking of the bank of the lower intake.

The California Development Company was beyond question in control of the entire work of diverting the water from the river for this irrigation system. It was so provided in its contract with the Mexican Company and was reaffirmed in the contracts with the Mutual Water Companies. The Mexican Company, if it acted at all, was a mere formal instrument or agent, acting for and under the direction of the California Development Company. It was a creature of the latter company, and the employés who did the work testified that they were employed by the latter company. If it was technically otherwise, they do not appear to have known anything about it. But the important fact is that the California Development Company furnished the means, surveyed the canals, made the diversions from the river to the canals, and was the principal party in carrying forward the scheme. It was therefore charged with the duty of maintaining the intakes in such condition that water flowing through should not carry away the banks, and, admitting a flood, destroy the property of others. But it is claimed with respect to the Mutual Water Companies that they became independent by the sale of the stock of the companies to the settlers. Admitting this to be true, it does not appear that the water companies had any control over the diversion of the water from the Colorado river, and it is this fact that primarily determines whether they or the Mexican Company were necessary parties to this action. The question is: Who was responsible for the diversion of the waters from the Colorado river to the damage of the complainant? The testimony answers that question beyond a doubt. It was the California Development

Company and neither the Mexican Company nor the Mutual Water Companies were therefore necessary parties to this action.

It is objected that the court had no jurisdiction to compel the defendants to construct headgates in the republic of Mexico for the reason that the defendant would not have been permitted by the laws of Mexico to construct such headgates until the plans for such structures had been approved by the proper engineering authority of Mexico. The answer to this objection is the fact shown by the evidence that the only site for controlling headgates on the river below what is known as the Laguna dam, above Yuma, is at Hanlon's Heading, in California. This point was originally selected for that purpose and the title to the land for such headworks was acquired by the California Development Company. "This site," said Mr. Meserve, in his statement attached to the President's message, "also controls what might be called or termed the gateway for the carrying of waters into Mexico, and through Mexico again into the United States." This statement is fully confirmed by the evidence we find in the record. The decree does not compel the defendant to construct headgates in Mexico. The flow of the river into the Salton Sink was finally placed under control in February, 1907, but this was done by placing permanent dams across the breaks in the river bank with a concrete heading in the canal about eight or nine miles below Yuma, and this appears to be the only permanent and effective control that can be placed upon the river below the international boundary line. There is no evidence that the consent of the republic of Mexico was necessary or ever obtained or asked for the building of these dams or the placing of the concrete heading.

It is further objected that the court had no jurisdiction to decree an injunction in effect abating a nuisance caused by the construction of intakes in the republic of Mexico, and it is claimed that there is a rule supporting this objection to the effect that a court of equity can never compel a defendant to do anything which is not capable of being physically done within the territorial jurisdiction of the court. This rule undoubtedly obtains where the property injured is itself outside the jurisdiction of the court, which was the case in Northern Indiana R. Co. v. Michigan Cent. R. Co., 56 U. S. 232, 14 L. Ed. 674, cited by appellant. In that case the action was brought in the United States Circuit Court for the District of Michigan. Relief was prayed for an injury threatened or done to complainant's real estate in Indiana, and to its franchise which was inseparably connected with the realty in that state. The Supreme Court held that the Circuit Court in Michigan was without jurisdiction to protect property in Indiana. The same situation was found in Mississippi & Missouri R. Co. v. Ward, 67 U. S. 485, 17 L. Ed. 311. In that case the action was brought in the District Court of the United States for the District of Iowa. The bill charged the defendant with having created a nuisance by erecting a bridge across the Mississippi river at Rock Island. The complainant was part owner of three steamboats, and commanded one of them. These boats were accustomed to pass through the draw of this bridge in navigating the Mississippi river. It was alleged that the boats were much in-

jured and delayed by the bridge, which it was charged was a great obstruction to navigation. The Illinois draw passage embraced the main channel of the river, and it was through this passage that steamboats had at all times navigated, and it was in the Illinois draw that the complainant's boats sustained the injury alleged in the complaint as special damage. The complainant was therefor suffering an injury to his property by reason of an obstruction in the river in that state, and he brought suit in Iowa for the abatement of the bridge as a nuisance because of its danger to navigation. The trial court ordered the removal of so much of the bridge as was in the state of Iowa; the middle of the Mississippi river being the dividing line between the states of Iowa and Illinois. The Supreme Court of the United States held that the navigation of the river so far as complainant was concerned would not be improved by the removal of the Iowa end of the bridge, and that the court had no jurisdiction over the local object inflicting the injury to complainant's property in Illinois.

In the case of Gilbert v. Moline Water Power & Manufacturing Co., 19 Iowa, 319, it was held that an Iowa court could not restrain a defendant from maintaining a dam across a portion of the channel of the Mississippi river between points in the state of Illinois whereby plaintiff's land in Iowa was overflowed, citing the case of Mississippi & Missouri R. Co. v. Ward, supra, as authority. It does not appear that the overflow of plaintiff's land was because of any negligence on the part of the defendant in erecting or maintaining the dam. It had been maintained for many years, was supposed to have been placed where it was by consent of the state of Illinois, and was a legal structure in that state serving a legitimate and useful purpose. The controversy in the case was over the question of the concurrent jurisdiction of the states of Illinois and Iowa over the Mississippi river in such a case. The jurisdiction was denied. It would seem, however, from the facts stated that the remedy was an action at law for damages in a court of competent jurisdiction. We do not think that the law of such a case is applicable here.

The injury charged in the present case was an injury to property within the jurisdiction of the court, and the party charged with the commission of the injury was also within the jurisdiction of the court. The cause of the injury was not serving a useful purpose for any one, and the relief asked for was that the party causing the injury might be enjoined from continuing to injure complainant's property within the jurisdiction of the court. Why may not a court restrain a party over whom it has jurisdiction from injuring property within its jurisdiction? How does it affect the question of jurisdiction or venue to say that the party on whom the court must act may find it necessary to do things outside the jurisdiction of the court in order to comply with the order of the court? May this not often happen, and would it not happen oftener, if it were determined that such an excuse was sufficient to defeat the jurisdiction of the court? In criminal law he who on one side of a boundary shoots a person on the other side is amenable where the blow is received. Wharton's Criminal Law, § 279. In United States v. Davis, Fed. Cas. No. 14,932, the indictment was for

manslaughter. The accused was master of an American ship lying in the harbor of Raiatea, one of the Society Islands and a foreign government. A gun in the hands of the accused on board the American ship went off, and killed a person on board a schooner belonging to the natives lying in the same harbor. It was held by Mr. Justice Story that the act was in contemplation of law done on board of the foreign schooner where the shot took effect, and that jurisdiction of it belonged to the foreign government, and not to the courts of the United States having jurisdiction over the American ship. In Simpson v. State, 92 Ga. 41, 17 S. E. 984, 22 L. R. A. 248, 44 Am. St. Rep. 75, it was held by the Supreme Court of Georgia that one who in the state of South Carolina aims and fires a pistol at another who at the time is in the state of Georgia is guilty of the offense of "shooting at another in the state of Georgia." The court said:

"Of course, the presence of the accused within this state is essential to make his act one which is done in this state, but the presence need not be actual. It may be constructive. The well-established theory of the law is that, where one puts in force an agency for the commission of crime, he in legal contemplation accompanies the same to the point where it becomes effectual. * * * So, if a man in the state of South Carolina criminally fires a ball into the state of Georgia, the law regards him as accompanying the ball, and as being represented by it up to the point where it strikes."

In the State v. Hall, 114 N. C. 909, 19 S. E. 602, 28 L. R. A. 59, 41 Am. St. Rep. 822, the defendants were indicted, tried, and convicted of the crime of murder in North Carolina upon testimony tending to show that the deceased was wounded and died in the state of Tennessee, and that the fatal wounds were inflicted by the defendants by shooting at the deceased while they were standing within the boundary of the state of North Carolina. It was held by the Supreme Court of North Carolina, citing numerous authorities, that the courts of North Carolina had no authority to prosecute a person for murder who while standing within the boundaries of that state wrongfully shoots across the line and kills a person in another state for the reason that the crime of murder was committed where the shot took effect. In civil actions the jurisdiction of the court depends upon the question whether the action is local or transitory. In Will's Gould on Pleading, p. 268, the author says:

"A local action is one which must still be laid in the county in which the cause of action actually arose. A transitory action may be laid in any county which the plaintiff may prefer."

After referring to the fact that the present locality of actions is founded in some cases on common-law principles, and in others on positive enactments of statute law, a number of actions are mentioned which continue local by the common law, and the author says:

"If, however, a tortious act, committed in one county, occasions damage to land or any other local subject situate in another, an action for the injury thus occasioned may be laid in either of the two counties, at the choice of the party injured. Thus, if by the diversion or obstruction of a water course in the county of A. damage is done to lands, mills, or other real property in the county of B., the party injured may lay his action in either of those two counties."

In England the rule has been stated to be that where the action is founded on two things done in several counties, and both are material or traversable, and the one without the other does not maintain the action, the plaintiff may bring his action in which county he will. Bulwer's Case, 7 Coke Rep. 1a; 77 Eng. Rep. 411. Among the examples given is the following:

"If a man doth not repair a wall in Essex which he ought to repair, whereby my land in Middlesex is drowned, I may bring my action in Essex, for there is the default, as it is adjudged in 7 H. 4. 8, or I may bring in Middlesex, for there I have the damage, as it is proved by 11 R. 2. Action sur le Case, 36."

In Barden v. Crocker, 10 Pick. (Mass.) 383, the rule in the Bulwer Case was held to be decisive of a similar question of jurisdiction in Massachusetts. The action was brought in the county of Plymouth against the defendants for erecting a dam in the county of Bristol, across Taunton Great river, by which the passage of alewives up that river and Nemasket river in Middleborough, in the county of Plymouth, was prevented. It was objected by the defendant that the plaintiff was not entitled to maintain an action in the county of Plymouth. In the Supreme Judicial Court the authorities upon this question are fully discussed, and the court says:

"He [the plaintiff] may unquestionably maintain his action in either county, in Bristol where the obstruction was raised, as well as in Plymouth where the injury was sustained. The law to be collected from Bulwer's Case, 7 Co. 1, is decisive upon this point. 'When one matter in one county is depending upon the matter in another county, the plaintiff may choose in which county he may bring his action.'"

The court also refers to the case of Thompson v. Crocker, 9 Pick. (Mass.) 59, where the cause of action was for flowing back of water upon the plaintiff's mills in the county of Plymouth by a dam which was in the county of Bristol. In that case the action was brought in the county of Plymouth alleging "that the defendants had wrongfully kept up a certain mill dam across the river below the said mills" of plaintiff. It appeared that the defendant's dam was in Taunton in the county of Bristol. The defendants contended that this was a fatal variance from the declaration. The Supreme Judicial Court held the variance immaterial "for the injury done to the plaintiff's mills is the substance of the complaint, and the place where the injury was done, to wit, at the mills, gives the locality of the action, and not the source from which the mischief came."

In Phelps v. McDonald, 99 U. S. 298, 308, 25 L. Ed. 473, the court said:

"Where the necessary parties are before a court of equity, it is immaterial that the res of the controversy, whether it be real or personal property, is beyond the territorial jurisdiction of the tribunal. It has the power to compel the defendant to do all things necessary, according to the lex loci rei sitæ, which he could do voluntarily, to give full effect to the decree against him. Without regard to the situation of the subject-matter, such courts consider the equities between the parties, and decree in personam."

In Miller & Lux v. Rickey (C. C.) 127 Fed. 573, the action was brought in the Circuit Court for the District of Nevada to restrain the defendants from the wrongful diversion of the waters naturally flow-

ing down the stream of both forks of the Walker river having their source in California, and flowing down into and through the state of Nevada, where the lands of the complainant were situated. The alleged diversion was in the state of California, and the injury caused by such diversion was in the state of Nevada. It was contended on behalf of the defendant that the Circuit Court in Nevada was without jurisdiction, first, because the suit was of a local nature, and could not be brought outside of the state of California; second, because the water right in controversy was in California; third, because the wrongs and injury alleged to have been committed by the defendant were committed wholly in the state of California; fourth, that complete relief could not be decreed by the Nevada court in favor of the complainant without reaching the property rights of the defendant which were situated wholly in California. Judge Hawley in an elaborate opinion considered the question of jurisdiction as presented by these objections, and reviewed the authorities upon the subject, meeting and answering the objection raised and urged by the defendants in this case that the court could not send its process to execute its decree into foreign territory. The court says on page 580:

"That this court has jurisdiction over the person of the defendant is unquestioned. It can reach him by injunction, and punish him for contempt if he violates it. This doctrine had its foundation in the equity courts of England at an early day"—citing the case of Penn v. Lord Baltimore, 1 Ves. Sr. 443, 454; 27 Eng. Rep. 1132, 1139, decided in 1750, where Lord Chancellor Hardwicke said:

"As to the court's not enforcing the execution of their judgment, if they could not at all, I agree it would be in vain to make a decree, and that the court cannot enforce their own decree in rem in the present case. But that is not an objection against making a decree in the cause, for the strict primary decree in this court as a court of equity is in personam. * * * In the case of Lord Anglesey of land lying in Ireland I decreed for distinguishing and settling the parts of the estate, though impossible to enforce that decree in rem; but, the party being in England, I could enforce it by process of contempt in personam and sequestration, which is the proper jurisdiction of this court."

The court accordingly maintained its jurisdiction of the action, and on appeal to this court the question was fully considered and the jurisdiction of the Circuit Court sustained. Rickey Land & Cattle Co. v. Miller & Lux, 152 Fed. 11, 81 C. C. A. 207. It may be further stated that in Massie v. Watts, 6 Cranch, 148, 157, 3 L. Ed. 181, Chief Justice Marshall cited the case of Penn v. Lord Baltimore, and made the same application of the doctrine of jurisdiction of courts of equity as was made by Judge Hawley in Miller & Lux v. Rickey. We are of the opinion, therefore, that the court had jurisdiction in the present case to protect property within its jurisdiction, and to restrain the defendant from diverting the waters of the Colorado river to the damage of such property, notwithstanding the defendant may find it necessary in complying with the decree of the court to perform acts beyond the jurisdiction of the court.

The next objection to the decree is that the court was in error in holding that, if when the suit was brought there were grounds for injunction, such grounds had not been removed by the destruction of complainant's works, and by the closing of the breaks in the Colorado

river. The court was of the opinion that the complainant was entitled to have its freehold right protected without regard to the amount of the damage threatened, otherwise the overflow sought to be abated might by prescription ripen into a servitude upon the land. Furthermore, the present safeguards against overflow might be but temporary, while the complainant's remedial rights if it had any, included permanent relief. Defendant's objection is based upon the theory that the decree provides full compensation for the value of complainant's overflowed land as well as for the works destroyed, and that the decree operates as a condemnation of the entire property, leaving nothing in the complainant to be protected by injunction. The answer to this objection is that the land is not destroyed. It is true there is an award of damages for the "salt crust" destroyed, but it does not appear that the "salt crust" was the entire value of the land. It is true, also, that the land is now under water, and is likely to remain so for some time, but the land itself remains the property of the complainant, and in course of time the water may be removed by seepage or evaporation, and the land again become valuable. At all events, the complainant has a right to the land, and the court has determined that this freehold right should be protected. This is clearly the law in this state.

In Learned v. Castle, 78 Cal. 454, 18 Pac. 872, 21 Pac. 11, the action was for damages for an alleged nuisance and for a mandatory injunction to prevent its continuance. It was alleged that plaintiffs were the owners of certain lands in San Joaquin county; that by reason of certain obstructions placed by the defendant across certain sloughs for the purpose of diverting their waters into a canal the waters were prevented from flowing naturally down the sloughs and away from plaintiff's land, and were turned upon complainant's land to their great injury. It was objected, among other things, that the damage was too small to be considered in determining the question of the nuisance. In answer to this objection the court said:

"But the amount of damage, estimated in money, was immaterial. That finding was only as to the damage done in 1878, when there was water on the land from other sources. The findings show that the waters diverted by the canal 'flow' upon plaintiff's land, which would not flow there if allowed to take their natural course; and that the embankments erected by defendants 'cause' such artificial flowing. And to thus wrongfully cause water to flow upon another's land which would not flow there naturally is to create a nuisance per se. It is an injury to the right, and it cannot be continued because other persons (whether jurors or not) might have a low estimate of the damage which it causes. And especially is this so when the continuance of the wrongful act might ripen into a right in the nature of an easement or servitude. Richards v. Dower, 64 Cal. 64, 28 Pac. 113, and cases there cited; Tootle v. Clifton, 22 Ohio St. 247, 10 Am. Rep. 732; Casebeer v. Mowry, 55 Pa. 419, 93 Am. Dec. 766; Wood on Nuisances (2d Ed.) p. 639. The right to an injunction therefore in such a case does not depend upon the extent of the damage measured by a money standard. The maxim, 'De minimis,' etc., does not apply. The main object of the action is to declare a nuisance, and to prevent the continuance by a mandatory injunction."

In Vestal v. Young, 147 Cal. 715, 82 Pac. 381, the plaintiff acquired land by patent from the United States in 1883. In 1865, and while this land was unoccupied land of the United States, the defendants or their grantors constructed across the land a flume ranging from two

172 F.—52

to three feet in width and about sixteen inches in depth, and diverted water from Pitt river into said flume, and by means thereof conducted the water across the land to their own adjoining lands, where they used it for beneficial purposes. In the year 1896 defendants, without plaintiff's consent, constructed on plaintiff's land about six rods of ditch on a line different from, and from one to 20 feet distant from, the flume line. In the year 1900 defendants, without plaintiff's consent, extended the six rods of ditch to a ditch four feet in width and three feet in depth, extending across the northern portion of the plaintiff's land for about one-fourth of a mile on a line distant from one to 20 feet from the flume line, but extending in the same direction. Ever since then defendants had carried their water across plaintiff's land by means of the said ditch, and threatened to continue so to do. They had discontinued the use of the flume with the exception of about five rods at the intake of the water from the river. The trial court entered a judgment enjoining the defendants from maintaining the ditch. The Supreme Court, in reviewing this judgment, said:

"It is suggested that the trial court did not find in what particulars the plaintiff will be obstructed in his rights to the free use and possession of his land, or injured in his property, by the maintenance of the ditch. The facts found and detailed above sufficiently show this. By the maintenance and use of the ditch plaintiff is deprived of the free use and possession of his real estate without right—and will be permanently deprived thereof if such maintenance and use are continued. This alone is sufficient to entitle plaintiff to the relief by injunction granted. It is the settled law of this state that irrespective of other damage an injunction will be granted to prohibit the continuance of action that obstructs one in the free use and enjoyment of his land where such action, if continued, will ripen into an easement."

There are a number of objections to the decree directed to the conclusions of the court that the waters which overflowed complainant's lands and destroyed its property were largely, if not entirely, the waters diverted from the Colorado river through defendant's intakes; that defendant was negligent, among other respects, in not selecting proper places for such intakes, and not providing suitable headgates to control the flow of water through the intakes, and that such negligence was the direct and proximate cause of the overflow of complainant's land and the resulting loss of its property; that the flooding of Salton Sink in the year 1905, and the destruction of complainant's property, was occasioned by the fault and negligence of the defendant. We have carefully examined the testimony in this case, and we think it fully supports the conclusions of the court below. It will serve no useful purpose to review this testimony. Its main features are practically uncontradicted. The intakes constructed by the defendant for drawing water from the river into its canals were not properly selected, and were negligently constructed. There were no headgates, or method or device for regulating the amount of water drawn into the canal. The two upper intakes were in succession closed by the deposit of silt, and during the season of flood water coming down the Colorado river in 1905 the banks of the river at the third intake were carried away, and the entire river turned into a channel which carried the flood down into the Salton Basin, destroying complainant's salt works and submerging its land. The diversion of the river was made by the defendant, and

made in such a negligent manner that it resulted in the injury complained of. This was a continuing nuisance and trespass existing at the time of the commencement of the action, and with respect to the land or free-hold estate continuing down to the entry of the decree, for which an injunction was the only plain, adequate, and complete remedy. The fact that an extraordinary flood came down the river contributing to the disaster does not relieve the defendant from responsibility. Under the conditions prevailing in that locality and known to have existed for many years, it was the duty of the defendant to have maintained proper control of the water at its headgates.

In Kinney's Law of Irrigation, the author in section 314 states the law upon this subject as follows:

"It is the duty of all irrigation companies in building ditches, canals, aqueducts, reservoirs, and other works to so construct them that, so far as human foresight can reasonably determine, the lives and property of the people living below them will be safe from breakage and overflow. Where a company constructs a ditch which passes over the land of others, it is bound to construct it and use it so as not to injure those lands regardless of the question as to who has the older right or title; and if, through any fault or neglect of the owner of the ditch in not properly constructing, managing, and repairing the ditch, the water overflows or breaks through the banks, and destroys or damages the lands of others, either by washing away the crops or soil, or covering the land with sand or débris, the owner of the ditch is liable for such injury. However, the owners of the ditch or canal may not be held liable for what is known as an act of God, unless the acts of the owners are combined with it in such a manner as to render him liable."

In section 315 the author refers to the case of Chidester v. Consol. Ditch Co., 59 Cal. 203, where Mr. Justice Thornton, rendering the opinion of the court, said:

"No one is responsible for that which is merely the act of God or inevitable accident. But when human agency is combined with it, and neglect occurs in the employment of such agency, a liability for damages results from such neglect. Such is the rule laid down and applied in Polack v. Pioche, 35 Cal. 416, 95 Am. Dec. 115. 'The expression' (the expression referred to is that comprised in the words, 'act of God') 'excludes the idea of human agency, and, if it appears that a given loss has happened in any way through the intervention of man, it cannot be held to have been the act of God, but must be regarded as the act of man.' Polack v. Pioche, 35 Cal. 423, 95 Am. Dec. 115, per Sanderson, J., delivering the opinion of the court. See cases cited in the opinion; Wharton on Negligence, §§ 553, 559, and cases cited; Broom's Legal Maxims, 'Actus dei nemine facit injuriam,' pp. 227, 228. The learned author just referred to states the rule thus: 'The act of God signifies, in legal phraseology, any inevitable accident occurring without the intervention of man, and may, indeed, be considered to mean something in opposition to the act of man, as storms, tempests, and lightning. The above maxim may therefore be paraphrased and explained as follows: It would be unreasonable that those things which are inevitable by the act of God, which no industry can avoid, nor policy prevent, should be construed to the prejudice of any person in whom there has been no laches.' Broom's Legal Maxims, pp. 227, 228." See, also, Farnham on Waters and Water Rights, § 634.

The evidence shows conclusively that it was defendant's method of constructing the intakes that resulted in turning the flood of the Colorado river into Salton Sink. The floods of this river in 1905 and 1906 were great, but no greater than would have been anticipated by a prudent person in view of all the conditions and the history of that river. There is no evidence that the heavy rains in the summer of 1904

in the immediate vicinity of Salton Sink contributed in any degree to the flooding of the sink in March, 1905. There is no evidence that any water reached Salton Sink after November, 1904, and up to January, 1905, except the water diverted by the defendant from the Colorado river, a fact practically admitted by the witness Rockwood who testified on behalf of the defendant.

The decree of the Circuit Court is affirmed.