## THE SALTON SEA CASES.†

### NEW LIVERPOOL SALT CO. v. CALIFORNIA DEVELOPMENT CO. et al. (two cases).

(Circuit Court of Appeals, Ninth Circuit. August 2, 1909.)

Nos. 1,649, 1,659.

INJUNCTION (§ 223*) — ACTS CONSTITUTING VIOLATION—CONSTRUCTION OF DE-CREE.

Defendant by the negligent construction of the works by which it diverted water from the Colorado river into its irrigation canal caused an overflow through a breach in the bank, creating a lake in the Salton Basin, which covered and practically destroyed the value of complainant's property situated in the basin. In a suit by complainant it was awarded damages for the injury, and also an injunction restraining defendant from diverting water from the river in excess of the substantial needs of the people dependent on its canal, from permitting any waste water to flow on or over complainant's land, or into the lake in such amount as would "substantially increase the amount of water therein," or prevent the decrease thereof by natural causes. Defendant's canal was the only source of water supply for an arid valley some 30 miles long and containing 20,-000 people, who were wholly dependent thereon for water for domestic purposes and the raising of crops. It appeared that in order to supply their needs, and especially to meet emergencies, as in case of hot winds to which the valley was subject, it was necessary to run through the canal, which was 61 miles long, a quantity of water somewhat in excess of the average consumption, and that the excess, when unused, was discharged through waste gates and flowed into the lake at a point some 40 miles from complainant's land, but not in such quantity as to materially affect its volume. Held that, giving the decree a proper and reasonable construction, such waste of water into the lake did not work substantial injury to complainant, and was not a violation of the injunction.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. § 448; Dec. Dig. § 223.*]

Appeal from and Writ of Error to the Circuit Court of the United States for the Southern Division of the Southern District of California.

See, also, 172 Fed. 792.

Edward J. McCutchen and Purcell Rowe (Page, McCutchen & Knight, of counsel), for appellant and plaintiff in error.

John S. Chapman and E. A. Meserve (Eugene S. Ives, of counsel), for appellees and defendants in error.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

MORROW, Circuit Judge. In California Development Company v. New Liverpool Salt Company (just decided) 172 Fed. 792, the decree in favor of the complainant was entered on January 10, 1908. On March 27, 1908, the complainant presented to the court a petition by way of complaint for an attachment to issue forthwith for the arrest of Epes Randolph, H. T. Corey, and F. C. Herrmann, officers of the defendant having supervision and management of the business and operations of the defendant, including the diversion of water from the Colorado river. It was charged in the complaint that these officers had been guilty of contempt of court in disobeying and violating the decree and injunction therein contained, and the prayer of the complaint was that they should be punished accordingly.

The decree contained the following provisions:

"That defendant be perpetually enjoined and restrained from diverting from the Colorado river any of the waters thereof in excess of the substantial needs of the people dependent upon the canal described in complainant's bill of complaint for water supply for domestic and irrigation uses and purposes, and such other lawful purposes as the same may be applied to. * * *

"That the said water so diverted, whatever may be the amount, shall be so controlled and used that the same shall not flow upon the lands of the complainant described in the bill of complaint. * * *

"That the defendant be required to regulate the flow of any water that may be diverted by it so that there shall be no waste water flowing therefrom as the result of such diversion upon or over the lands of complainant, above described.

"That said defendant be restrained from turning out of its canals any waste water at any point whence the same will naturally flow upon or over the lands of complainant, or flow into the lake now covering the Salton Sink, and thereby substantially increase the amount of water therein, or maintain the amount of water therein, or prevent the decrease thereof by natural causes."

In the complaint filed with the court it was alleged that ever since the rendition and entry of said decree defendant, under the direction and management of said Randolph, Corey, and Herrmann, and by their orders and direction, had maintained at the head of its canal on the Colorado river a headgate through which the flow of water from the Colorado river into said canal was regulated and controlled; that said headgate was so built and devised that defendant could prevent any water from flowing into said canal, or could allow such quantities to flow therein as it might determine; that at all times since the 14th day of March, 1908, defendant, by the orders and direction of said Randolph, Corey, and Herrmann, had taken and diverted into said canal from the Colorado river a large volume of water, to wit, water in excess of 1,000 second feet, and had daily discharged and delivered from its canal at points east and north of Calexico, in the county of Imperial, state of California, into a certain water course or channel known as the Alamo Channel, leading from the places and points at which said water was so discharged into it to Salton Sink, a quantity of water not less at any time than 90 cubic feet per second, and as much at times as 252 cubic feet per second, all of which water so discharged into said channel or water course had naturally flowed over the lands of complainant and into Salton Sink, increasing the amount

of water therein, and preventing the decrease of water therein by natural causes.

It was further alleged that the water in Salton Sink at all times from January 28, 1908, to March 27, 1908, covered complainant's lands described in the final decree, to wit, sections 11, 15, and 23, and the N. E. 1/4 of the N. W. 1/4 of section 14, and the N. E. 1/4 of the N. E. 1/4 of section 14, all in township 8 S., range 10 E., San Bernardino meridian, situated in the county of Riverside, state of California. Upon the hearing of the order to show cause the court construed its decree, and upon the evidence submitted determined that the diversions complained of were not violations of the injunction, and the rule against the respondents was accordingly discharged. For the review of this judgment the complainant brings the case here by appeal and writ of error.

It appears from the testimony submitted to the court that during the years 1905 and 1906 there were a number of overflows of the Colorado river, and the time came when nearly the whole of the waters of the Colorado river were pouring through the Alamo Channel and into Salton Sink, and the result of the successive floods was that a lake was created in the Salton Basin about 40 miles in length from north to south and varied in its width, averaging about 10 miles in width; that the area of said lake as computed and estimated by the geological survey of the United States was about 460 square miles; that the depth of the lake at the deepest point was about 80 feet; that, in order to shut out the waters of the Colorado river and control the diversion of the same, it became necessary to expend a large amount of money, which it was estimated on information and belief amounted in the aggregate to $3,000,000; that this money was furnished by the Southern Pacific Railroad Company under an understanding and agreement with the California Development Company; that the work was completed by the Southern Pacific Company in February, 1907, and a concrete headgate constructed about nine miles below Yuma, whereby the waters were controlled in their diversion through defendant's canal. It appears, further, that the whole area of the Imperial Valley susceptible of cultivation and irrigation in valuable crops is at least 700,000 acres; that the 200,000 acres approximately now under cultivation extends over a considerable distance, being about 30 miles in length from north to south, and about 25 miles in width from east to west in the widest place. There are five towns in Imperial Valley, namely, Calexico, Brawley, Holtville, El Centro, and Imperial. The population of these towns is estimated to number about 3,000; and in Imperial Valley, including these towns and the settlers upon the lands, the population is estimated to be about 20,000. In all of these towns the houses are generally lighted with electricity furnished by the Holton Power Company, situated near the town of Holtville. Electricity is also used to some extent in the various towns for mechanical purposes, and it is estimated that perhaps the most important is the manufacture of ice which is necessary in the shipment of products out of the valley as well as for domestic use among the people. There is no source from which water can be obtained for these purposes or to supply the want of Imperial Valley for domestic and irrigation uses and purposes,

except the waters of the Colorado river furnished through the canals of the defendant. The value of the property in Imperial Valley dependent upon the defendant's canal system is estimated at $10,000,000.

It appears that the water diverted by the defendant from the Colorado river is carried by its canal and the channel of the Alamo river from the point of diversion for a distance of about 61 miles to a point known as Sharp's Heading, where the waste gate is situated, and where the delivery of water is made to the first of the six water companies engaged in receiving and distributing water in Imperial Valley for domestic and irrigation purposes and uses. From Sharp's Heading to the Holton power plant is about 11 miles, from the Holton power plant to the southeast end of Salton Lake is about 28 miles, while complainant's land is from 40 to 45 miles still further to the west and north beneath the waters of the other end of the lake.

The acts of the defendant which were made the subject of complaint to the court below were the turning of water into the channel of the Alamo river through the waste gate at Sharp's Heading and the laterals of the Imperial Water Companies, and at the tailrace of the Holton power plant, and the diversions of water from the Colorado river for the purpose of scouring and removing the silt from defendant's canal. The amount of water thus turned into the channel of the Alamo river and flowing on to the Salton Sea or Lake amounted, as estimated by the defendants, to approximately 150 second feet, but as claimed by the complainant 250 second feet. The use of water for scouring purposes appears to have been only occasional—two or three times a year during the season when there was but little if any irrigation—and the only diversion on that account after the final decree and prior to the entry of the judgment of the court in the contempt proceedings was 617 second feet turned out at Sharp's Heading on February 9, 1908. The showing made by the defendant was to the effect that, while there was more water diverted from the Colorado river than was actually consumed by the people in Imperial Valley for all the purposes named, nevertheless such a diversion was necessary in order to supply the substantial needs of the people dependent upon the canal system, and it was claimed that the entire waste did not substantially increase the amount of water in the Salton Sea or Lake, all of which it was contended was within the provisions of the decree. The explanation made by the evidence on behalf of the defendant for the diverting of more water from the river than was actually consumed in Imperial Valley was the long distance from the point of diversion to Imperial Valley, about 61 miles; the length of time required for the water to flow down to the point of distribution about 36 hours; and the loss in transmission from 15 to 30 per cent. according to the volume of water diverted ranging from 700 to 1,500 second feet. Further, the climatic conditions required that there should be sufficient water flowing in the canal to the points of distribution during the irrigation season to furnish an increased supply of water for emergencies when periods of excessive heat or hard dry winds suddenly absorb the moisture from the soil and destroy the crops unless there is an immediate flooding of the land. Sometimes there are heavy rainfalls within a period of a few hours, and within an equally short time a

dry wind may, and often does, sweep over the country making the immediate irrigation of the fields imperative to save the crops, especially is this the case of young crops of alfalfa, young trees, melons, beans, and all tender and shallow rooted plants. It also appeared that the waste from the tailgate of the Holton Power Plant was unavoidable, as is the occasional scouring of the canal to remove the silt to prevent the filling up of the canal and the destruction of the system. There was evidence that this waste water did not substantially increase the depth of water over complainant's land.

The complainant contends that the defendant can only carry on its business of supplying water to the inhabitants of Imperial Valley if it can do so without discharging any waste water upon the lands of the complainant; that is to say, into the Salton Sink. But if, on the other hand, it cannot carry on its business without discharging waste water into the Salton Sink so that such water with the accumulated water of the Sink flows upon complainant's lands, then defendant must cease to carry on its business of diverting water from the Colorado river. The complainant's construction of the decree amounts to this: That it provides:

"That the defendant be perpetually enjoined and restrained from diverting from the Colorado river any of the waters thereof if any such waters shall flow upon or over the lands of the complainant; that is to say, if any such waters shall flow into the Salton Sink covering the lands of the complainant."

But the court did not enter such a decree.

The decree provides that the diversion of water from the Colorado river shall not be "in excess of the substantial needs of the people dependent upon the canal," and that any waste water turned out of the defendant's canal shall not be such an amount as will "flow into the lake now covering the Salton Sink and thereby substantially increase the amount of water therein or maintain the amount of water therein, or prevent the decrease thereof by natural causes." These two provisions evidently relate to present conditions in the locality where the decree is to operate and while complainant's land is covered by the waters of the Salton Sink. But there are other conditions which appear to relate to the future when by seepage or evaporation the water shall disappear from complainant's land, and the land be no longer covered by the waters of the Salton Sink. The decree provides that the water diverted from the Colorado river "whatever may be the amount shall be so controlled and used that the same shall not flow upon the lands of the complainant." The decree also provides that:

"The defendant be required to regulate the flow of any water that may be diverted by it so that there shall be no waste water flowing therefrom as the result of such diversion upon or over the lands of the complainant."

And further:

"Defendant is restrained from turning out of its canals any waste water at any point whence the same will naturally flow upon or over the lands of complainant."

These last provisions clearly refer to the future time when the complainant's lands shall not be covered by the waters of Salton Sink, but

shall be lands over which waste water might flow. When that condition arrives, then the defendant must so control and regulate the flow of water in the canal that the same shall not flow upon complainant's land, and it must refrain from turning waste water out of its canal so that it shall flow upon complainant's land. It is the province of equity to deal with conditions as they may arise, and provide a remedy to fit the changing conditions of the case. In Pomeroy's Equity Jurisprudence, § 109, the author says:

"Equitable remedies, on the other hand, are distinguished by their flexibility, their unlimited variety, their adaptability to circumstances, and the natural rules which govern their use. There is, in fact, no limit to their variety and application. The court of equity has the power of devising its remedy and shaping it so as to fit the changing circumstances of every case. and the complex relations of all the parties"

In section 111 the author says:

"Equity has followed the true principle of contriving its remedies, so that they shall correspond both to the primary right of the injured party, and to the wrong by which that right has been violated. It has, therefore, never placed any limits to the remedies which it can grant, either with respect to their substance, their form, or their extent; but has always preserved the elements of flexibility and expansiveness, so that new ones may be invented, or old ones modified, in order to meet the requirements of every case, and to satisfy the needs of a progressive social condition, in which new primary rights and duties are constantly arising and new kinds of wrongs are constantly committed."

This is plainly what the court did in this case. It considered the extraordinary conditions prevailing and the probable changing conditions that will prevail in this large territory, and had in view not only the present and future rights of the complainant, but the present and future rights also of a large number of people residing in that territory. It also had in view the fact that the court had in its final decree awarded full compensation for the destruction of its salt beds and works, its houses, and all other improvements which had been upon its land; the various items aggregating $456,716.23. The only injury not remedied by the award was that to the freehold or the tenure by which the land is held. From the fact that the salt beds and works had been destroyed and the land itself submerged to a depth of 75 or 80 feet, and no probability of a complete subsidence of the lake under 15 years, it is evident that the title to or ownership of the land was not considered worth very much, and not entitling the complainant to a decree of such a positive and sweeping character that it would practically result in destroying all other interests in Imperial Valley.

When it appeared, therefore, that from the evidence that under all the circumstances water in excess of the substantial needs of the people dependent upon the canal was not diverted from the Colorado river, and that the waste water now flowing into the Salton Sink did not substantially increase the amount of the water therein, it was properly determined, as we think, that the acts of the defendant did not come within the prohibition of the decree.

The judgment of the Circuit Court is therefore affirmed.